**SIGNED.**

**Dated: October 28, 2010**

_____
**JAMES M. MARLAR**
**Chief Bankruptcy Judge**
_____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Proceedings |
| | ) | |
| SEASONS PARTNERS, LLC, | ) | No. 4:09-bk-24017-JMM |
| | ) | |
| Debtor. | ) | |

## MEMORANDUM DECISION:
## PLAN CONFIRMATION

Presented to the court over a two-day period, September 9 and 14, 2010, was the plan of reorganization proposed by the Debtor (ECF Nos. 46, 89, 111, 141, 150 and 158) (collectively, the "Plan").

Evidence was taken in the form of numerous documents and witnesses, and the parties have filed written memoranda on legal points, and further addressed their positions through discussion during the hearings.

The court has considered all sides of the issues, has carefully reviewed the pertinent record in this case, and now rules.

## I. CREDITOR'S MOTION FOR "RECONSIDERATION" OF VALUATION OPINION

Recently, the parties asked the court to value the property (ECF No. 98), and it did so, finding the value to be $11,600,000 (ECF No. 130) (July 19, 2010).

Now, at confirmation, the Debtor has prepared its case based upon that figure, and the creditor, ML-CFC 2006-3 Seasons, LLC, acting by and through its special servicer and sole member, ING Clarion Capital Loan Services, LLC ("ING" or the "Secured Creditor") has elected to be treated as fully secured pursuant to 11 U.S.C. § 1111(b)(2). However, in spite of that election, the Secured Creditor asks the court to "reconsider" its valuation order.

The motion for reconsideration (ECF No. 148) will be DENIED for several reasons. First, value under § 506, and plan feasibility under § 1129(a)(11) are tested differently. Once a request for valuation is made, and a decision rendered within a very short time prior to confirmation, the parties must live with the value found, and not seek to change it due to continuing fluctuations of economic variables. The court should not have to constantly "re-value" property which it has already valued.

Second, now that the Secured Creditor has elected to be treated as fully secured under § 1111(b)(2), the only relevant issue becomes whether the Debtor's Plan to pay it the full amount of the claim, over time, is feasible. So long as the Secured Creditor receives its allowed claim, in dollars, it matters not how those dollars are labeled, be they principal or interest. The election

Case 4:09-bk-24017-BMW    Doc 181    Filed 10/28/10    Entered 10/29/10 08:26:34    Desc
Main Document    Page 2 of 22

means only that the Secured Creditor will receive the full amount of its allowed claim.  Revaluation is therefore meaningless in view of the election.

Accordingly, the motion to reconsider and revalue the secured property will be DENIED.

## II.  THE PLAN

The Debtor originally filed a plan on December 24, 2009 (ECF No. 46), and amended it on April 23, 2010 (ECF No. 89), June 8, 2010 (ECF No. 111), August 26, 2010 (ECF No. 141), September 6, 2010 (ECF No. 150) and September 10, 2010 (ECF No. 158).  The final iteration of these various plans proposes to treat the Debtor's creditors in the following manner:

| Class | Type | Treatment | Last Change to Treatment | Comment |
|---|---|---|---|---|
| 1 | Secured Tax Claims | Retain liens.  Paid in 2 instalments, every 6 months, all due one year post-confirmation.  16% interest. | 04/23/2010 | |
| 2 | Tenant Lease Rejections | Forfeit security deposits. | 04/23/2010 | Deleted 09/10/10 |
| 3 | ING | Retain lien.  Allow secured for $11.6 million (determined by court).  Receive $1,125,000 on effective date.  Also remit all but $300,000 of accumulated cash.  Interest only for 2 years at 6.25%.  Then amortized at same interest rate for 25 years, with balloon 12 years from confirmation.  No prepayment penalty.  Default and late charges waived.  Because of § 1111(b) election, claim paid in full by maturity. | 08/26/2010 | |
| 4 | Wells Fargo | Paid $20,000 upon confirmation. | 09/10/2010 | |
| 5 | Administrative Convenience (Unsecured) | $10,000 or below can elect to receive 50%, up to cap of $5,000, at confirmation.  Balance paid in equal instalments over 5 years, beginning at 3rd anniversary.  No interest. | 09/06/2010 | |
| 6 | Unsecured Trade | Paid 10%, with 3.55% interest over 9 years. | 09/06/2010 | |
| 7 | Affiliates | Paid after all other classes. | 12/24/2009 | |
| 8 | Interest Holders | No payment on account of old interests.  Must contribute to receive new interest. | 12/24/2009 | |

3

After the court approved the Debtor's Disclosure Statement (ECF No. 114), both it and the Plan were circulated to the various classes of creditors. The creditors voted, and the Debtor filed a tally with the court as to the results of the voting by each class. (Amended Ballot Report, ECF No. 161).

Only the Class 3 Secured Creditor, ING, has rejected the Plan and modifications, and has objected to confirmation. At one point, Wells Fargo Bank had objected, but it now supports the treatment afforded it under the Plan.

## A. The Debtor and the Plan

The Debtor owns and operates a student housing apartment complex in Tucson, Arizona. After suffering from start-up problems relative to a general turndown in the economy, poor management and tenant destruction of property, the Debtor found itself with insufficient cash flow with which to service its debt.

It filed Chapter 11 on September 25, 2009.

Its Plan calls for a reorganization of its equity interests, and an infusion of new capital, by John Fina and by entities named Conix, Inc. and Return Enterprises II, LLC,[1] with which to begin implementation of its Plan. The total infusion of new capital is $1.5 million. It also hired a third-party management company, Campus Advantage, which has been able, through aggressive marketing techniques, to raise the occupancy level to somewhere in the 83% range.

Campus Advantage, which began its involvement in March, 2009, has been proven to be a positive attribute for the property. Once the damaged units are brought back on line, the prospects for even better cash flow will present themselves.

Dr. Jennifer Casey testified on behalf of the current management company, and, referring to current rent rolls and pro-forma estimates of future income and expenses (Exs. 1 and 2),

---

[1] Return Enterprises initially is a lender to the Debtor, but after the loan is repaid, it obtains an indefinite interest in surplus net cash flows (Ex. 13).

opined that the apartments will remain attractive to students. She felt that within a reasonable period of time the apartments would approach 90-95% occupancy.

When Campus Advantage began its management, there was a 30-40% vacancy rate. Now, general occupancy is up to 83%, and 90% of the undamaged, leaseable units are rented. Nine units are currently damaged and not in leasable condition.

John Fina, one of the Debtor's principals, testified that at one point, occupancy had been as low as 45%, but matters clearly were improving swiftly, due to Campus Advantage's aggressive marketing and management efforts. In addition, adding Conix and Return Enterprises II[2] as equity partners, and infusing $1.5 million of new money into the project ($1,125,000 of which would pay down ING's secured debt), was a positive step. The cash infusion of $1.5 million is held in escrow and is on hand (Ex. 13). Mr. Fina also testified that in the Plan's twelfth year, the secured debt would have been sufficiently paid down to enable a successful refinancing of the property.

The Debtor presented Randall P. Sanders as its interest rate expert. After explaining his methodology and qualifications, Mr. Sanders opined that a market rate of interest for the apartment project, taking risk and the quality of collateral into account, was 6.25% (*see* Exs. 3 and 7).

In contrast to Mr. Sanders, ING's interest rate expert was John Ferrell. Mr. Ferrell explained how he approached finding a "market" rate, and he differed with Mr. Sanders in that he felt a market rate was 9.15%. Mr. Ferrell's approach was more complex in determining how his rate was derived than was Mr. Sanders' approach (Exs. N and O).

Mr. Ferrell did, however, positively support the Plan's feasibility and the ability of the Debtor to refinance at the end of the Plan's term.

Three other tangential witnesses also testified. Court Gettel testified that the $1.5 million was in escrow; Art Wadlund testified that there exists active interest in multi-family housing even in today's depressed real estate market; and John Sundt indicated an interest in buying or investing in the project.

---

[2]    See previous footnote.

Case 4:09-bk-24017-BMW    Doc 181    Filed 10/28/10    Entered 10/29/10 08:26:34    Desc
Main Document    Page 5 of 22

# III.  THE CONFIRMATION ELEMENTS OF § 1129--THE 16 ELEMENTS

Confirmation has two major parts:  (1) the § 1129(a) factors, comprised of 16 separate areas of inquiry and proof, and (2) § 1129(b)'s scrutiny for whether a plan treats dissenting classes fairly and equitably.  If it is found to have done so, a plan can be confirmed in spite of any objections, and dissenters will be bound by the plan.

The court is charged with the responsibility of determining whether a debtor has proven each of the applicable elements of § 1129.  It does this by measuring the factual evidence against the appropriate legal standards.

## A.  Sections 1129(a)(1) and (2)--General Compliance

The section requires that the plan and plan proponent (here, the Debtor) have complied with applicable bankruptcy law.  This means that the law has been followed throughout the administrative portion of the case, appropriate fees and reports have been tendered, that the court and creditors have been privy to financial information, that in all respects a debtor has been transparent and candid in its communications, and that it has materially complied with the substantive bankruptcy statutes and rules.

ING has objected on the grounds that the Debtor has not complied with these sections, because it asserts that the Plan fails to address its 11 U.S.C. § 1111(b)(2) election.  However, the Plan does propose that ING's entire claim (over $22 million) will be paid off by the Plan's maturity. This objection is not supported by any omission within the Debtor's Plan.  It will therefore be OVERRULED.

Here, the administrative record supports the finding that the elements of § 1129(a)(1) and (2) have been met.  All necessary professionals in the case have been appointed by the court, fees for those professionals have been disclosed and vetted, and procedures for noticing out the Debtor's Plan with adequate disclosure (§ 1125) have been followed.  There has been no assertion

6

that the solicitation process for votes has been tainted or is otherwise improper. Therefore, it appears that, in general, these provisions of the Bankruptcy Code have been satisfactorily met.

## B. <u>Section 1129(a)(3)--Good Faith</u>

Good faith is an inherent requirement which runs throughout the entire Bankruptcy Code. Because the bankruptcy court is a court of equity, as well as a court of law, and because of the fluidity of bankruptcy proceedings, equity demands a constant balancing of the competing needs of the various constituencies. It is essential that bankruptcy proceedings be transparent, candid and always operate in that spirit.

In its most basic sense, "good faith" means honesty in purpose, faithfulness to one's duty or obligation, observance of concepts of fair dealing, and the absence of intent to defraud or to seek unconscionable advantage. BLACK'S LAW DICTIONARY (9th ed. 2009). The bankruptcy definition most commonly applied is that the good faith, which is needed to confirm a plan of reorganization, requires the plan to achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *In re Sylmar Plaza, L. P.,* 314 F.3d 1070, 1074 (9th Cir. 2002) *(citing In re Corey*, 892 F.2d 829, 835 (9th Cir.1989)); *In re Stolrow's, Inc.*, 84 B.R. 167, 172 (9th Cir. BAP 1988); *In re Jorgensen*, 66 B.R. 104, 108-09 (9th Cir. BAP 1986). In order to determine good faith, a court must inquire into the totality of circumstances surrounding the plan, the application of the principles of fundamental fairness in dealing with creditors, and then decide whether the plan will fairly achieve a result consistent with the objectives and purposes of the Code. *Sylmar Plaza*, 314 F.3d at 1074; *Stolrow's,* 84 B.R. at 172; *Jorgensen*, 66 B.R. at 109; *see also In re Kemp*, 134 B.R. 413, 414-15 (Bankr. E.D. Cal. 1991); *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir. 1984).

ING objected because of the lack of disclosures as to Conix's ability to properly manage the business. However, that aspect of one of the earlier plans is now moot, as the Debtor is not proposing to transfer the property to Conix. To the extent that Conix is involved, it is now only as a new equity partner which is infusing new capital.

This objection, made under 11 U.S.C. § 1129(a)(3), will be OVERRULED.

## C.  Section 1129(a)(4)--Professional Fees

The Debtor has, to this point, and intends in the future, to ask the court to approve its professional fees as reasonable.  This element has been satisfied.

## D.  Section 1129(a)(5)--Future Management

The Debtor has disclosed its future management structure.  Indeed, continued service by prior management may be inconsistent with the interests of creditors and public policy if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor.  *Beyond.com*, 289 B.R. at 145 *(citing In re Polytherm Indus., Inc.*, 33 B.R. 823, 829 (W.D. Wis. 1983)); *In re Sherwood Square Assocs.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989);  *In re SM 104 Ltd.*, 160 B.R. 202 (Bankr. S.D. Fla. 1993) (manager who diverted rents, violated court orders, made misrepresentations to secured creditors, commingled funds and maintained a grossly inadequate accounting system, was prohibited by § 1129(a)(5) from continuing in that capacity).  Those types of problems are not evident here.

To the extent that this objection relates to a now superceded transfer provision to Conix, it is moot.  Therefore, the objection on § 1129(a)(5) grounds will be OVERRULED.

The Debtor has satisfied its burden as to § 1129(a)(5).

## E.  Section 1129(a)(6)--Governmental Rate Control

This element of § 1129(a) is inapplicable to this Debtor.  No creditor or class raised an objection on this ground, and thus the court finds that § 1129(a)(6) does not apply.

**F.  Section 1129(a)(7)--Best Interests of Creditors Test**

This section of § 1129(a) requires, with respect to each impaired class of claims or interests, that each holder of a claim or interest in the class either accept the plan or receive under the plan at least as much as it would receive on liquidation. *In re Mid Pac. Airlines, Inc.*, 110 B.R. 489 (Bankr. D. Haw. 1990). This is commonly referred to as the "best interests of creditors test." *In re M. Long Arabians*, 103 B.R. 211, 215 (9th Cir. BAP 1989).

In its Disclosure Statement (ECF No. 112) the Debtor detailed its best estimation of how creditors would fare in a hypothetical liquidation.  For unsecured creditors, the estimated recovery for each unsecured claim was zero.

The Plan proposes to pay trade debt 10% of their claims, plus interest.  This class voted in favor of the Plan.  This element is therefore satisfied.  ING, as a fully secured § 1111(b)(2) creditor, lacks standing to argue over this provision, which the affected class has approved.

The ING objection, on § 1129(a)(7) grounds, will be OVERRULED.

The Debtor has therefore sustained its burden of proof relative to § 1129(a)(7), and that element of § 1129 has been satisfied.

**G.  Section 1129(a)(8)--Each Class Must Accept or is Left Unimpaired**

This provision of the Code is the counterpart of §§ 1129(a)(10) and 1129(b)(1).  If each class accepts or is left unimpaired, this provision is satisfied.  If one or more classes dissent and reject the plan, then the debtor must have at least one other impaired class which consents to the plan.  § 1129(a)(10).  Then, if all of the other § 1129(a) factors are satisfied, the case may proceed to the fair and equitable considerations of § 1129(b) (the "cramdown").

Here, the Debtor cannot satisfy § 1129(a)(8) because it does not have unanimous class consent for its Plan.  Class 3, ING, has objected.  All other voting classes have consented to the Plan.

9

But, since it has at least one impaired consenting class, § 1129(a)(8) simply becomes inapplicable, and is replaced by § 1129(a)(10) and § 1129(b)(1).

### H.  Section 1129(a)(9)--Priorities

ING objected on this ground, arguing that the taxing authorities are not being paid as the Code requires.  But the taxing authorities have not objected.  ING's standing to argue this provision on their behalf is misplaced.  Its objection will be OVERRULED.  The Debtor has satisfied § 1129(a)(9).

### I.  Section 1129(a)(10)--At Least One Impaired Consenting Class

As noted above, in the § 1129(a)(8) discussion, the Debtor has cleared this statutory hurdle, because it has several impaired classes, not including "insiders," which have voted in favor of the Plan.

Section 1129(a)(10) has been satisfied.

### J.  Section 1129(a)(11)--Feasibility

Feasibility is the heart of every Chapter 11 reorganization case.  It is the most important element of § 1129(a).  Section 1129(a)(11) permits confirmation only if:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

"The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."  *In re Pizza of Haw., Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129-34 (15th ed. 1984)).

"A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable. . . .The prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required. . . . The mere potential for failure of the plan is insufficient to disprove feasibility." *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 674 (D. Ariz. 1994).

Every debtor is required to present "ample evidence to demonstrate that the Plan has a reasonable probability of success." *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129-52, (16th ed. 2010). Section 1129(a)(11) "requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." *Id.* at 1129-53 (citation omitted). In order to determine whether § 1129(a)(11) is satisfied, a court must "scrutinize the plan to determine whether it offers a reasonable prospect of success and is workable." *In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998). Plans which are based on speculation are not proper candidates for reorganization. *Pizza of Haw., supra.*

In evaluating the feasibility of a plan, the Ninth Circuit's BAP has directed courts to consider several factors, including: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re Wiersma*, 324 B.R. 92, 113 (9th Cir. BAP 2005), *aff'd in part and rev'd in part on other grounds,* 483 F.3d 933 (9th Cir. 2007).

If a final payment, in the form of a "balloon" payment, is proposed to come from new financing to be acquired by the Debtor in the form of some new lending vehicle, then proof of feasibility is necessary. Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood. *See In re Inv. Co. of The Southwest, Inc.*, 341 B.R. 298, 311, 314, 316 (10th Cir. BAP 2006) (plan not feasible where there was no evidence to demonstrate how the debtor would be able to fund required balloon payments).

11

1    A court may not confirm a plan if its feasibility depends on future refinancing, unless

2    there is an adequate evidentiary showing that such refinancing is likely to occur.  *See In re Made*

3    *in Detroit, Inc.*, 299 B.R. 170, 179-80 (Bankr. E.D. Mich 2003) (plan not confirmed when proponent

4    made inadequate showing of ability to obtain financing); *In re Vanderveer Estates Holding, LLC*,

5    293 B.R. 560 (Bankr. E.D.N.Y. 2003) (similar); *In re Walker* 165 B.R. 994 (E.D. Va. 1994) (similar

6    with respect to future sale of property).

7        Here, several witnesses testified as to the Plan's feasibility, their testimony was

8    credible and the current performance and future projections show that the Plan is feasible.

9        As for future management concerns, this proof is also critical in evaluating the

10   feasibility of a reorganization plan.  *See, e.g., In re Gulph Woods Corp.*, 84 B.R. 961, 974 (Bankr.

11   E.D. Pa. 1988); *In re Rusty Jones, Inc.*, 110 B.R. 362, 367, 372, 375 (Bankr. N.D.Ill. 1990)(finding

12   Chapter 11 plan not to be feasible, in part, because "there can be no assurance of proper

13   management in the future" due to management's lack of experience in the debtor's business and

14   their prior bad acts).

15       Here, after considering each piece of evidence presented by both sides, both written

16   and oral, the court finds and concludes that the Debtor has met its evidentiary burden.  The

17   cumulative witness testimony presented by the Debtor was frank, honest and persuasive, and it was

18   presented by individuals who have credible personal and professional credentials.  Their testimony

19   was to the point, and it was believable.  After considered review of the evidence, the court concludes

20   that the weight of the evidence, on all aspects of feasibility (current payments, interest rate and a

21   balloon in twelve years time) was credible.

22       When evaluating expert opinions on such matters as interest rates and feasibility, the

23   court is left to choose between two versions of the same "truth."  Only one version can prevail.  In

24   this case, the court is persuaded that the Debtor proved its feasibility case by a cumulative approach,

25   whereby the court was able to meld the facts and opinions from several sources, rather than rely

26   exclusively on the opinions of a single witness.

27

28

1    Weighing the evidence, the court finds and concludes that feasibility has been proven,

2   and that the interest rate proposed by the Debtor is representative of the current market.  On the

3   entire record before the court, the Plan is feasible and the interest rate is fair and equitable.

4           The discussion on interest rates is found, *infra*, in Section IV(A).

5           The Debtor proved § 1129(a)(11).

6

7                        **K.  <u>Section 1129(a)(12)--Fees</u>**

8

9           The U.S. Trustee has not objected on the grounds that its fees, or related fees, are

10   unpaid.  No creditor has suggested that compliance with this section is incomplete.

11           The court therefore finds and concludes that this provision of the Code has been

12   satisfied.

13

14                   **L.  <u>Section 1129(a)(13)--Retiree Benefits</u>**

15

16           No party has objected to the Debtor's Plan on the basis that the Debtor has violated

17   this provision of the Bankruptcy Code, because this section does not apply.

18           Accordingly, the court finds that § 1129(a)(13) is inapplicable.

19

20   **M.  <u>Section 1129(a)(14)--Domestic Support Obligations (Alimony; Child Support)</u>**

21

22           This section is not applicable to this Debtor.

23

24             **N.  <u>Section 1129(a)(15)--Individual Chapter 11 Case</u>**

25

26           This section is not applicable to this Debtor.

27

28

                                        13

### O. Section 1129(a)(16)--Transfers of Property

The final version of the Plan does not intend to transfer any of the Debtor's assets. No creditor or class has opposed confirmation on this ground. The only transfer is of a portion of the Debtor's equity, in order to fund the Plan on the effective date. But equity is not the type of "asset" affected by this section.

Therefore, this section either does not apply, or the Debtor has met whatever minimal burdens satisfy this Code provision.

## IV. SECTION 1129(b)--THE CRAMDOWN PROVISIONS
## AND UNFAIR DISCRIMINATION

If a debtor is able to prove each of the applicable elements of § 1129(a), as this Debtor now has, it then must run the gauntlet of § 1129(b), commonly known as "cramdown." What the Code attempts to do in this section is to have the court analyze, for each rejecting and dissenting class, whether the plan treats them "fairly" and "equitably," and does not unfairly discriminate against them. If a secured class objects, its treatment under the plan must pass through the fire of § 1129(b)(2)(A). Here, only ING has objected. It is a fully secured creditor, due to its election of § 1111(b).

If a debtor cannot satisfy the cramdown elements, contained in § 1129(b), then a plan cannot be confirmed.

### A. Class 3:  The Secured Debt to ING--Cramdown Interest Rates

### 1. In General

In order for cramdown to be implemented, and the Plan confirmed over a class' vote against it, the Debtor must show that the Plan does not unfairly discriminate against that dissenter,

and that its treatment is "fair and equitable." These latter terms have defined meanings, and in this case, require that its lien interests remain in place, and if payments are deferred and paid over a term, that those payments have appropriate "value." This "value" is generally understood to be a market rate of interest, considering the terms, quality of the security and any risk to be borne by the affected creditor. *In re P.J. Keating Co.*, 168 B.R. 464, 472 (Bankr. D.Mass 1994) (quoting applicable portion of §1129(b)(2)(A)). As a result, the interest rate paid to the secured creditor must be an appropriate rate of interest so that the creditor may realize the present value of the secured portion of the claim. *In re Landscape Assocs., Inc.*, 81 B.R. 485, 487-88 (Bankr. E.D. Ark. 1987). If a Chapter 11 plan proposes payment of an interest rate below the "range of prevailing market rates for loans of comparable risk and duration" or which does not take into account the actual risk of that loan, confirmation must be denied because the deferred payments will not yield the present value of the claim and, therefore, the plan is not "fair and equitable" and will not satisfy § 1129(b)(2)(A)(i)(II). *See, e.g., In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 706 (Bankr. S.D.N.Y. 1993).

Some courts calculate the permissible interest rate for a Chapter 11 plan using a "formula" approach, i.e., starting with a base rate--such as the prime rate or the rate on treasury obligations--and adding a risk factor. *See, e.g., Camino Real Landscape Maint. Contractors, Inc.*, 818 F.2d 1503, 1508 (9th Cir. 1987); *In re LWD, Inc.*, 332 B.R. 543, 556 (Bankr. W.D. Ky. 2005), *aff'd,* 340 B.R. 363 (W.D. Ky. 2006). In *Till v. SCS Credit Corp.*, 541 U.S. 465 (2003), the Supreme Court adopted this formula approach for calculating interest in Chapter 13 cases. Under *Till*, interest on a secured claim is calculated based on the national prime rate and adding a risk premium--to account for the dual risks of inflation and default. *Id*.

In light of the difference between the existence of a market for cramdown loans in Chapter 11 cases, and the lack of such a market in Chapter 13 cases, the *Till* Court acknowledged that a somewhat different analysis may be required in Chapter 11 cases. That is, it may be appropriate for a court to determine the rate of interest in an "efficient" market, assuming such a market exists. *Till*, 541 U.S. at 477 n.14.

15

The Ninth Circuit suggests that it is the burden of the debtor in a Chapter 11 case[3] to introduce "sufficient evidence" which will establish that the proposed adjustments to the interest rate will take into consideration "the term of deferment of present use and risk of default, as affected by any security." *Camino Real*, 818 F.2d at 1507.

It would not be an exaggeration to state that cases abound on this subject, and that "one size does not fit all." In other words, there are many different kinds of approaches to how this test is met, depending on the unique circumstances of a given case.

For example, some authorities in the Ninth Circuit support the use of the blended rate analysis. *In re Boulders on the River, Inc.*, 164 B.R. 99, 105-06 (9th Cir. BAP 1994) (approving the lender's use of the blended rate methodology to determine the cramdown interest rate on a secured real estate loan under a Chapter 11 plan that provided the creditor with an 88.5% loan to value ratio); *In re North Valley Mall, LLC*, 432 B.R. 825, at *6-7 (Bankr. C.D. Cal. June 21, 2010) (Albert, J.) (reviewing and analyzing *Till* and then utilizing the blended rate approach with three "tranches" or tiers: a "senior tranche" covering the debt up to the first 65% of value, a "mezzanine tranche" covering the debt up to the next 20% of value, and an "equity tranche" covering the last 15% of value). Post-*Till*, in a Chapter 11 income-producing real estate case, the Court in *North Valley Mall* observed:

> [T]he blended rate approach suggested in cases like *Boulders* and in the Reehl and Milner articles is not an attempt to mirror an *actual* market that exists. Rather, it is an attempt by principled approach to create a proxy for a market extrapolated from current data such that the court can reach the ultimate question of "present value." . . . .
>
> . . . .
>
> [I]t [one expert's testimony using this method] makes some reasonable attempt to recognize that the level of risk changes depending upon whether a lender is at the 66% mark on the collateral, or the 99% mark. Just because the marketplace right now does not quote on mezzanine debt does not change this reality nor should it, in the Court's view, constrain the parties

---

[3]  The Supreme Court in *Till* places the burden of proof on the creditor in a Chapter 13 plan confirmation dispute to establish the evidentiary predicate for the appropriate "build up" on the prime rate due to the existence of identified risk factors. *Till*, 541 U.S. at 479.

16

from interpolating data in a principled way to recognize this difference. As stated above, the formula or blended rate approach is not merely a mirror of market conditions; rather, it is a principled derivation from current data of a proxy rate where no market currently exists.

*Id*. at \*6 (alteration added).

For at least the last 20 years, the Ninth Circuit Court of Appeals has instructed bankruptcy courts to assess, and whenever possible use a "formula approach," and consider "the risks associated with a given debtor and the security associated with a specific debt." *In re Fowler*, 903 F.2d 694, 697-99 (9th Cir. 1990); *see also Camino Real*, 818 F.2d at 1508.

As noted, the formula approach was recognized by the United States Supreme Court in *Till*, 541 U.S. at 479-480. *Till* recognized that the factors relevant to the risk adjustment fall squarely within the bankruptcy court's area of expertise, and that the court must "select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan." *Id*. Such adjustments recognized by other bankruptcy courts are generally approved at 1- 3%. *Id*. at 480.

In *Till*, the Supreme Court rejected three alternative approaches to setting a cramdown interest rate: the coerced loan, presumptive contract rate, and cost of funds approaches. "Each of these approaches is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value." *Id*. at 477.

As case law has evolved since *Till*, another approach is obtaining traction. In both *In re American Homepatient, Inc.*, 420 F.3d 559 (6th Cir. 2005) and *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1 (D. Conn. 2006), these courts urged the bankruptcy courts to first consider whether an "efficient market" exists, and if so, to utilize those rates. If no efficient market exists, then a bankruptcy court should fall back on the formula approach. *See generally* Gary W. Marsh, Matthew M. Weiss, *Chapter 11 Interest Rates After Till*, 84 AM. BANKR. L.J. 209 (Spring 2010) (review of development of cramdown interest rates since 2004).

In the final analysis, though, this court has always taken comfort in the very practical, easily-understood cases from the Ninth Circuit, *Camino Real* and *Fowler*. And this court, speaking only for itself, appreciates the understanding of the *Camino Real* court, where respected Ninth

Circuit Judge Joseph Sneed, speaking for the Circuit, observed that the setting of cramdown interest rates carries some degree of subjectivity:

> Finally, the *Armour* court increased the treasury bill rate by 2% for risk, then decreased it by 1% to account for the security. The government claims that the magnitude of these adjustments was arbitrary. To some degree that may be true. But rough estimates are better than no estimates. We are willing to rely on the expertise of the bankruptcy judge in a case such as this, particularly where no contrary evidence was introduced. A bankruptcy court should be accorded substantial deference in these matters because it has "almost daily experience with the rates charged by actual commercial lenders and other financier's [sic] of chapter 11 debtors." *In re Fi-Hi Pizza*, 40 B.R. 258, 271 (Bankr. D. Mass.1984). We uphold the bankruptcy court's judgment here.

*Camino Real*, 818 F.2d at 1508. The Circuit, in *Fowler*, further asked the trial courts to follow the "guiding principal . . . that the bankruptcy court's findings must be sufficient to allow meaningful review, and must demonstrate to the reviewing court that the bankruptcy judge's determination was supported by the evidence." *Fowler,* 903 F.2d at 699 n.7.

Although *Fowler* was a Chapter 12 case, the Circuit found no significant differences to distinguish it from the cramdown exercise in either that Chapter or Chapter 11.[4] In instructing the trial courts on cramdown rates, the Circuit explained that they were to look to either "market interest rates for similar loans" or use the "formula approach" and measure the risk and the security. *Id.* at 698.

In *Fowler*, 903 F.2d at 696-97 (citing 5 COLLIER ON BANKRUPTCY ¶ 1225.03[4][c], at 1225-21 (15th ed. 1989)), the Circuit said:

> When the debtor's plan proposes to pay a secured claim in deferred cash installments, the court must find that the present value of the proposed payments is not less than the allowed amount of the secured claim. In order to make this finding, it will be necessary for the court to apply a discount factor to the proposed stream of payments to determine the present value of those payments. This is typically accomplished by ascribing an interest rate

---

[4] Nor has the Ninth Circuit's BAP questioned this logic. *See In re Yett*, 306 B.R. 287, 290-91 (9th Cir. BAP 2004). *See generally* David G. Epstein, *Don't Go and Do Something Rash about Cram Down Interest Rates*, 49 ALA. L. REV. 435, 439-42 (Winter 1998); C.B. Reehl, Stephen P. Milner, *Chapter 11 Real Estate Cram-down Plans: The Legacy of Till*, 30 CALIF. BANKR. J. 405 (2010).

to the allowed amount of the claim and by requiring payment of the amount of the claim along with interest at the specified rate.

Whether one starts with a "base rate" and adds for risk, or just accepts that a proven market rate includes relevant risk (in an appropriate case), the result should not vary by much. A contract rate of interest may be evidence of the proper rate for a plan, but it is neither presumptive nor conclusive. *See Till*, 541 U.S. at 477-78 (rejecting presumptive contract rate approach in favor of the formula approach). In the final analysis, the interest rate determination is to be made on a case-by-case basis. *Boulders*, 164 B.R. at 105; *Camino Real*, 818 F.2d at 1508.

Finally, *Fowler* requires the bankruptcy courts to make "explicit findings" regarding (1) how it assesses the risk of default; (2) how it assesses the nature of the security; (3) what market rates exist for the type of loan at issue; and (4) what risks reduce or heighten the risks associated with a particular debtor. *Fowler*, 903 F.2d at 699.

With these principles in mind, the court now turns to the facts of this case, and the objections to the rate proposed in the Debtor's Plan.

## 2. **ING's Objection Regarding Cramdown Interest Rate**

ING's objection to confirmation (ECF Nos. 126 and 127) expresses a concern which, it argues, prevents approval of the Plan.

That concern has to do with whether the Debtor has proposed a proper rate of interest for the loans which are deferred. (Objection, ECF Nos. 126 and 127.) The court agrees that this factor is a matter of proof, and that it has weighed the evidence. The analysis made by the court utilizes all of the guidance provided by applicable case law, and it has reached a conclusion using its best efforts. The conclusion is that the Debtor's proposed rate for ING meets the test for "value" required by § 1129(b)(2)(A)(i)(II).

### 3. <u>Cramdown Findings</u>

Utilizing the 'explicit findings" requirement of the *Fowler* case, the court finds, as to the proposed interest rate and terms of ING's restructured Plan debt:

(a) The nature of the security is predictable and realizable. The collateral is now well-managed by the Debtor, and ING has reasonable methods to police its collateral on a regular basis. Post-confirmation reports will be provided by the Debtor. There are appropriate safe-guards in place, under unaltered provisions of ING's loan documents, to enable it to react quickly should the collateral be in danger of deteriorating. (Exs. A and B.)

(b) There are no additional factors associated with this Debtor which would heighten the risk to ING. The Debtor has stabilized itself from past problems. Current management has promptly addressed adverse issues such as low occupancy, and has properly righted itself in both management and financial controls. By receiving future monthly interest payments, as well as tax reserves, and in two years will also be receiving principal paydowns as well, ING can quickly react to financial difficulties which are not now anticipated, should they develop.

The rate proposed in the Plan reflects a market rate, and embedded within that rate is an appropriate risk factor. No additional risks exist which this court feels requires a premium to be added to the Plan's proposed rate. Mr. Sanders' opinion of a proper rate is accepted by the court.

(c) The court concludes, based on its finding that the Plan is feasible, that the Debtor is not likely to default or need further reorganization.

Case 4:09-bk-24017-BMW    Doc 181    Filed 10/28/10    Entered 10/29/10 08:26:34    Desc
Main Document      Page 20 of 22

1     (d)    The market rate, for the type of restructured loan proposed for ING,

2          was proven by a preponderance of the evidence to be the rate set forth

3          by the Debtor's expert witness, Randall P. Sanders.  His years of

4          expertise, in the area in which he testified, persuasively convinced the

5          court that his opinion was objective and consistent with the markets

6          today.  His demeanor in providing testimony was straightforward, easy

7          to understand, and was deeply rooted in experience.

8          Mr. Sanders did not stray from the path of his expertise.  As a result,

9          the court found that his testimony was credible in establishing an

10         appropriate market interest rate, and in proving the feasibility of

11         obtaining a new takeout loan 12 years in the future.[5]

12     The court therefore concludes that the proposed interest rate, for the term set forth by

13 the Plan, are fair and reasonable as to ING, and returns to it a fair rate of interest, considering all

14 relevant factors.

15

16             **4.  Cramdown as to Secured Creditor--Conclusion**

17

18     After assessment of the totality of the evidence surrounding the cramdown interest rate

19 proposed for ING, and for the reasons set forth above, the court finds and concludes that the rate

20 proposed by Debtor's Plan is fair and equitable to ING, and thereby §§ 1129(b)(2)(A)(i)(II) has been

21 properly proven.  ING's objection will be OVERRULED.

22

23         **B.  Section 1129(b)(2)(A)(i)(I)--Retention of Liens (Cramdown)**

24

25     The Plan proposes that ING retain its existing lien.  ING argues that a portion of its

26 cash collateral is being utilized by the Debtor for Plan purposes.  Although true, the argument fails

27

28      [5]    The conclusion is bolstered by the fact that ING's note interest rate was 6.125%
(Ex. A at 5).

to acknowledge that it will simultaneously be receiving $1,125,000 on the effective date, from the new money infused, as an immediate paydown on its debt. This new value vastly exceeds the cash collateral retained by the Debtor. Hence, this objection is moot.

As for concerns over the $1.5 million in the Merrill Lynch accounts, the Debtor's Plan simply leaves the existing agreement as to that "bundle" of collateral intact--with no changes. Therefore, ING's rights in that batch of collateral remain unchanged and unimpaired.

This section of the Code is therefore satisfied.

## V. <u>CONCLUSION</u>

The Debtor's Plan will be CONFIRMED. Debtor shall lodge a form of order consistent with this decision within 15 days.

DATED AND SIGNED ABOVE.

COPIES served via email on the date signed above:

Nancy J. March, Attorney for Debtor

Kasey C. Nye, Attorney for ML-CFC 2006-3 Seasons, LLC, acting by and through its special servicer and sole member, ING Clarion Capital Loan Services, LLC

Terri A. Roberts, Pima County Attorney's Office

Steven M. Cox, Attorney for Wells Fargo Bank, N.A.

Jeffrey Greenberg, Attorney for Debtor

Elizabeth C. Amorosi, Office of U.S. Trustee

By  /s/ M.B. Thompson
          Judicial Assistant

22